**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TIMOTHY COGHLAN, BRAD ELLISH, ANTHONY CALI and NATALIE LOFTUS, individually and on behalf of all others similarly situated, <br><br>                 Plaintiffs, <br><br>      v. <br><br> SAMSUNG ELECTRONICS AMERICA, INC., <br><br>                 Defendant. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT** |

Plaintiffs Timothy Coghlan, Brad Ellish, Anthony Cali and Natalie Loftus (collectively, the "Plaintiffs"), by their undersigned attorneys, bring this class action complaint against Samsung Electronics America, Inc. ("Samsung" or "Defendant"). Plaintiffs' allegations are based upon personal knowledge as to their own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.     This is a class action against Samsung for misrepresenting the energy efficiency of its televisions manufactured between 2011 and the present which feature Eco Sensor (automatic brightness control) and/or Motion Lighting (motion detection dimming) technology (collectively, the "Products"). Samsung misrepresents that the Products are among the most energy efficient of televisions ("the Misrepresentation") in a uniform fashion as a matter of company policy through (a) the ENERGYGUIDE labels affixed to all Products, and (b) the ENERGY STAR® logo, which indicates that the Products meet the ENERGY STAR® program standards for energy efficiency. However, independent testing commissioned by the Natural Resources Defense Council ("NRDC") reveals that the Products are programmed to silently disable key energy-saving features when consumers adjust the default picture settings.

1

Moreover, Defendant specifically optimized and tailored these energy-saving features to create a reduction in energy usage during testing with the U.S. Department of Energy ("DOE") that is not reflected under real world conditions.  Thus, the NRDC estimates that Samsung's conduct underlines the expected energy costs of the Products.

2.     The uniform Misrepresentation communicates to consumers that the Products are among the most energy efficient of televisions.  The fundamental bargain of the Misrepresentation is:  consumers pay a higher up-front purchase price for the Products, but save more on energy bills over time using the product.  This is an attractive bargain to many consumers because there is consumer demand for energy efficiency.[1]

3.     To capitalize on this demand, Samsung engaged in a long-term advertising campaign in which it utilized various forms of media to advertise that the Products are among the most energy efficient of televisions.  For example, Samsung boasts on its website that "all Samsung TVs are Energy Star compliant."[2]

4.     Consumers look for the ENERGY STAR® logo when evaluating whether a product is among the most energy efficient in its class.  "The ENERGY STAR® logo is a critical tool for consumers looking to save energy and money with their appliances," said Scott Blake Harris, the DOE's General Counsel.  In fact, "[t]he ENERGY STAR mark ranks among the highest level of influence on product purchase among all consumer emblems, similar in ranking to the Good Housekeeping Seal."  Indeed, a 2012 National Association of Home Builders ("NAHB") Home Trends & Buyer Preferences survey also acknowledged that ENERGY STAR® was the feature most desired by appliance purchasers, picked by 94% of respondents.

5.     Similarly, the ENERGYGUIDE label affixed to every Product provides consumers with an estimate of the television's annual energy costs.  Additionally, the ENERGYGUIDE label provides a range of energy costs for similar models.  This allows consumers to understand how a product's energy use compares to the energy use of similar

---

[1] *See* http://www.nielsen.com/us/en/insights/news/2015/consumers-want-energy-efficiency-but-what-will-they-do-about-it.html ("consumers still view home efficiency as their top unmet demand need … ") (last visited Oct 5, 2016)

[2] *See* http://www.samsung.com/us/support/answer/ANS00041247/ (last visited Oct. 5, 2016)

products.[3]  Accordingly, a single glance at one of Defendant's ENERGYGUIDE labels communicates the message that the Products are among the most energy efficient of televisions.

6.      However, in September 2016, the NRDC, with the help of Ecos Research ("Ecos"), released a report entitled *The Secret Costs of Manufacturers Exploiting Loopholes in the Government's TV Energy Test: $1.2 Billion For Consumers & Millions of Tons of Pollution* (the "NRDC Report").  The NRDC Report was based on (i) a comprehensive laboratory testing of selected televisions energy efficiency, and (ii) additional in-store testing to observe the persistence of key energy-saving features.[4]

7.      The NRDC Report concluded that Samsung's energy-saving features are active during the DOE's testing of the Products, but are designed to be silently disabled whenever a consumer changes the default picture settings.[5]  Thus, Samsung's Misrepresentation – that the Products are among the most energy efficient of televisions – is based on energy-saving features that Samsung has ensured will be silently and invisibly terminated or inactive during normal consumer use.  Notably, without these features active, "Samsung televisions' on-mode power use was more than double the usage levels with out-of-the box settings."[6]  Without these features, the Products, all of which received the ENERGY STAR label, would not so qualify.

8.      The promised benefits of efficiency and energy-savings were illusory.  For Class members who purchased the Products, the promised savings from reduced energy bills never came.  Instead, Samsung deployed firmware to make it all but certain that key energy-saving features would be inactive during normal consumer use.  Thus, Class members pay higher costs in two ways: a higher up-front purchase price due to the substantial price premium that the Misrepresentation commands in the marketplace, and/or higher energy usage (and cost) over the Product's life, since its actual energy consumption is substantially higher than what was

---

[3] *See* https://www.consumer.ftc.gov/articles/0072-shopping-home-appliances-use-energyguide-label (directing consumers to "Use the EnergyGuide label to compare the energy use of similar models.") (last visited Oct 5, 2016)

[4] https://www.nrdc.org/sites/default/files/costs-manufacturers-exploiting-loopholes-tv-energy-test-report.pdf ("NRDC Report")

[5] *Id.*

[6] *Id.*

promised.  Each Class member paid a higher initial price for their Product and will pay higher energy costs every month – for the anticipated use of the television.

## THE PARTIES

9.      Plaintiff Timothy Coghlan is a citizen of Illinois, residing in Cook County, Illinois.

10.      Plaintiff Brad Ellish is a citizen of New York, residing in Hartsdale, New York.

11.      Plaintiff Anthony Cali is a citizen of New York residing in East Setauket, New York.

12.      Plaintiff Natalie Loftus is a citizen of California, residing in Victorville, California.

13.      Defendant Samsung is a New York corporation with its principal place of business in Ridgefield Park, New Jersey.  Samsung is a wholly-owned subsidiary of Samsung Electronics Co. Ltd., which is a Korean company headquartered in Suwon, South Korea. Defendant has been and still is engaged in the business of distributing, marketing, and selling televisions throughout the United States and this District.  Samsung is one of the world's leading manufacturers of consumer electronics and home appliances.  Indeed, in October 2015, Samsung set a new record for television sales, earning over $1 billion in North America.[7]

## JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members for each relevant state and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.

15.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant Samsung does business throughout this District and Defendant has consented to this District, for personal jurisdiction and for the venue of this action.

---

[7] *Available at* http://www.theverge.com/2015/11/19/9760162/samsung-tv-sales-record-north-america (last visit, Oct. 5, 2016)

4

## FACTUAL ALLEGATIONS

**A.    The Importance Of The Misrepresentation To Consumers**

16.    Samsung communicates the Misrepresentation through (a) the ENERGYGUIDE labels affixed to all Products, and (b) ENERGY STAR® logos, which indicate that the Products meet the ENERGY STAR® standards for energy efficiency.  A single glance at one of Defendant's ENERGYGUIDE labels or the ENERGY STAR® logo communicates the message that the Products are among the most energy efficient of televisions.

17.    Samsung has articulated the importance of energy efficiency to its brand identity. Samsung represents that, "Our products are designed to make your life smarter, easier and better. It's not just about making your everyday life more convenient – we're working on building a smarter future for the world at large, and big part of that vision is environmental sustainability." Samsung's corporate website boasts that "Samsung Electronics has won the 2015 ENERGY STAR Partner of the Year – Sustained Excellence Award from the U.S. Environmental Protection Agency (EPA) for the third year in a row."

**1.    The ENERGYGUIDE Label Promise And Its Significant Effect On Consumers**

18.    The Federal Trade Commission ("FTC") requires all televisions manufactured after May 10, 2011 to affix or display ENERGYGUIDE labels. [8]

19.    "Unlike many years ago, before flat screens and plasma, today's televisions vary widely in the amount of energy they use," said FTC Chairman Jon Leibowitz commenting on the decision to expand the ENERGYGUIDE program to televisions.  "By comparing information on the EnergyGuide labels, consumers will be able to make better-informed decisions about which model they choose to buy, based on how much it costs to operate per year." [9]

20.    Indeed, the central purpose of the ENERGYGUIDE label is to communicate to consumers which products are among the most energy efficient in the marketplace.  As the FTC

---

[8] A*vailable at* https://www.ftc.gov/news-events/press-releases/2010/10/starting-2011-ftc-will-require-energyguide-labels-televisions (last visited October 5, 2016)

[9] *Id*.

website commented, "[ENERGYGUIDE] tells how much energy an appliance uses and makes it easier to compare the energy use of similar models."[10]

21.    Reproduced below is a typical ENERGYGUIDE label used by Defendant Samsung on its Products:[11]



22.    Defendant's ENERGYGUIDE labels reveal that the Products purportedly use a fraction of the energy used by "Similar Models."  Thus, the ENERGYGUIDE labels

---

[10] *Energy Guidance: Appliance Shopping with the Energy Guide Label available at* https://www.consumer.ftc.gov/articles/0072-shopping-home-appliances-use-energyguide-label (last visited October 5, 2016).

[11]*Available at* http://www.samsung.com/us/televisions-home-theater/tvs/4k-uhd-tvs/4k-uhd-ju7100-series-smart-tv-55-class-54-6-diag-un55ju7100fxza/ (last visited October 5, 2016)

communicate the Misrepresentation:  this television is purportedly among the most energy efficient of televisions.

### 2. The ENERGY STAR® Promise And Its Significant Effect On Consumers

23.     ENERGY STAR® is a government-backed voluntary program, designed to "identify and promote energy-efficient products in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards." *See* 42 U.S.C. § 6294a.  The program is jointly administered by the DOE and the Environmental Protection Agency ("EPA").

24.     The ENERGY STAR® program is not a regulatory program; rather, it consists of voluntary partnerships (with licensing agreements) between the DOE/EPA and industry participants that commit to manufacture products that meet the very highest standards of energy efficiency.  This licensing agreement, embodied in the standard partnership agreement ("Partnership Agreement") provides that both "parties concur that this agreement is wholly voluntary and may be terminated by either party at any time, and for any reason, with no penalty."  Furthermore, the Partnership Agreement states that the signatory or partner "will not construe, claim, or imply that its participation in the ENERGY STAR® program constitutes federal government approval, acceptance, or endorsement of anything other than Partner's commitment to the program.  Partner understands its participation in the ENERGY STAR® program does not constitute federal government endorsement of Partner or its buildings, homes, products, services, or industrial facilities."

25.     Since ENERGY STAR® is widely recognized as the preeminent brand for energy efficient products, participation in the ENERGY STAR® program has a significant impact on the marketability of products.  The most significant tool used in the ENERGY STAR® program is the ENERGY STAR® logo.

26.     The message and promise conveyed by the ENERGY STAR® logo is that the product is among the most energy efficient of similar products available in the marketplace.  An

ENERGY STAR® certification enables consumers to maximize their energy-savings while helping to protect the environment.  The national retailers that dominate the television market rely extensively on ENERGY STAR®-related promotions, as well as the distinctive logo, to sell televisions and bring consumers to their stores:



27.     The campaign to promote ENERGY STAR® has continued for almost two decades.  To promote the message of energy efficiency and savings, the EPA launched a broad outreach campaign in 1997, encouraging consumers to look for the distinctive ENERGY STAR® label.  The campaign prominently mentioned the environmental benefits of the ENERGY STAR® program, but the focus was still on the financial savings that consumers could realize through superior energy efficiency.  According to the EPA, the first consumer campaign had three key messages:

> **ENERGY STAR saves you money and protects the environment.**  Use of qualified products in your home can mean up to 30 percent savings.
>
> **The second price tag.**  Products have two price tags: the purchase price plus the cost of electricity needed to use the product over its lifetime.
>
> **An easy choice.**  Either the product is energy efficient because it displays the ENERGY STAR label, or it isn't.

28.     These marketing and educational efforts have culminated in one of the most recognizable, global symbols for energy efficiency.  Scott Blake Harris, General Counsel for the

DOE, has stated that "[t]he ENERGY STAR® label is a critical tool for consumers looking to save energy and money with their appliances."

29.     In fact, the ENERGY STAR® label was *specifically engineered* to convey a simple message to consumers:  that a given product is one of the most efficient of similar products within the market.  It is "extremely successful as an informational device."  Declaration of Catherine Zoi, Assistant Secretary, Office of Energy Efficiency and Renewable Energy, *LG Electronics U.S.A., Inc. v. DOE, et al.*, No. 09-2297-JDB (D.C. Dec. 23, 2009), Dkt. No. 10-7, at ¶ 19.  It sends an unequivocal message to consumers.

30.     The DOE and EPA have found that "[s]ubstantial portions of U.S. households in the surveyed population recognize, understand, and are influenced by the ENERGY STAR label."  This is supported by a prominent national survey conducted in 2011, which found that 85% of households had at least a general understanding of the label's purpose, including 75% that had a "high understanding."

31.     That same survey found the ENERGY STAR® logo materially influenced the purchasing decisions of 88% of households that recognized it, including 76% whose purchase decisions were influenced "very much" or "somewhat."

32.     In September 2010, the EPA prepared a PowerPoint presentation entitled "Energy Star® Sales Associate Training – Clothes Washers."  The EPA's PowerPoint presentation emphasizes that the ENERGY STAR® logo helps consumers easily identify energy-efficient products and that "[t]he ENERGY STAR mark ranks among the highest level of influence on product purchase among all consumer emblems, similar in ranking to the Good Housekeeping Seal."  Accordingly, the ENERGY STAR® logo could be relied upon by an objectively reasonable consumer to convey that an appliance is among the most energy efficient of its type.  The PowerPoint presentation also included the following slide showing that the ENERGY STAR® label has an influence on 91% of consumers:

# About ENERGY STAR





The ENERGY STAR mark ranks among the highest level of influence on product purchase among all consumer emblems, similar in ranking to the *Good Housekeeping* Seal.

♻ EPA

3

33.     A 2012 NAHB Home Trends & Buyer Preferences survey[12] acknowledged that ENERGY STAR® appliances were the features most desired by homebuyers, picked by 94% of respondents.  There is no doubt that appliance manufacturers such as Samsung consider the ENERGY STAR® label to be a "promise" of "savings" and "energy efficiency."

34.     Participation in the ENERGY STAR® program has a significant impact on the marketability of products.  The message conveyed by the ENERGY STAR® logo is that the product is among the most efficient of similar products available in the marketplace.

35.     Generally, consumers can expect ENERGY STAR® certified televisions to be on average, 25 percent more energy efficient than conventional models, saving energy in all usage modes:  sleep, idle, and on.[13]

---

[12] According to the NAHB, these results were obtained by surveys performed by NAHB and Better Homes and Gardens.

[13] *Available at* h*ttps*://www.energystar.gov/products/electronics/televisions (last visited Oct. 5, 2016)

36.     Samsung asserts on its website that "all Samsung TVs are Energy Star compliant."[14]

**B.     The NRDC Report And The Real Energy Use Of Samsung Televisions**

37.     Samsung televisions sold since 2011 are tested by the U.S. DOE to measure television energy use.  The DOE measures the energy use of new television models while playing a 10-minute video of assorted content developed by the International Electrotechnical Commission ("IEC") standards organization.[15]  The testing is conducted with the default picture settings activated.  As the NRDC Report explains:[16]

> **The results are used to determine the annual energy use listed on yellow EnergyGuide labels** (see example below), which are mandated by the Federal Trade Commission (FTC) to **appear on every television sold in stores**.  This allows consumers to compare the TV's energy use against the energy use of similar-size models before purchase.
>
> The test results also are used when manufacturers seek approval to display the **ENERGY STAR® label to indicate that the model is among the more energy efficient on the market**.

(emphasis added).

38.     In the 2016 NRDC Report, the NRDC and Ecos conducted comprehensive laboratory testing of select Samsung television models, specifically, model numbers UN55JU7100 and UN55JS9000.  Both of these Samsung models have two energy-saving features:  (i) a motion detection dimming program ("MDD") and, (ii) an automatic brightness control ("ABC").[17]

---

[14]*Available at* http://www.samsung.com/us/support/answer/ANS00041247/ (last visited Oct. 5, 2016)

[15] *Id*. at 12

[16] *Id*. at 5-6

[17] *Id*. at 12

39.     MDD, referred to as "Motion Lighting" by Samsung, decreases the brightness of the television screen when rapid scene changes occur.  This reduction in screen brightness can produce energy-savings.[18]

40.     ABC, referred to as "Eco Sensor" by Samsung, decreases television screen brightness based upon the amount of ambient light detected.  When ambient light decreases, the ABC decreases the screen brightness.  This reduction in screen brightness can produce energy-savings.[19]

41.     The NRDC Report, applying the DOE's methodology, tested the energy usage of the two Samsung television models.  To observe the impact of the energy-saving features, the NRDC Report alternately tested Samsung's televisions with ABC and MDD enabled and disabled.  The results are summarized in the table on the following page:[20]

| Table 2: Testing results for two Samsung TVs with and without MDD (Motion Lighting) and with ABC on and off. DOE test method with IEC test loop and default picture settings | | | | | |
|---|---|---|---|---|---|
| | | SAM 7100 | | SAM 9000 | |
| | Motion Lighting | Average Power (W) | Power Increase When ML Off | Average Power (W) | Power Increase When ML Off |
| ABC Off | Off | 124.91 | 25% | 180.50 | 45% |
| | On | 99.68 | | 124.89 | |
| ABC On* | Off | 67.66 | 13% | 87.91 | 16% |
| | On | 60.10 | | 76.12 | |

*Highlighted yellow power values are averages of four illuminance levels and what would be reported per the DOE test method.

42.     As the NRDC Report explains, these two energy-saving features have a massive effect on the energy used by Samsung televisions:[21]

> When both ABC and MDD were disabled, the Samsung
> televisions' on-mode power use was **more than double the usage
> levels with out-of-the-box settings** (125 watts instead of 60 watts

---

[18] *Id*. at 11

[19] *Id*.

[20] *Id*. at 14

[21] *Id*.

> for one TV, and 180 watts instead of 76 watts for the other). As
> discussed later in this report, there is a considerable likelihood that
> these two energy-saving features could both be automatically
> disabled at a time after the TV is first set up.

(emphasis added).

43.     The NRDC Report found that Samsung deployed a firmware bypass that silently

terminates these energy-saving features when consumers adjust the default picture settings. In

examining the persistence of the ABC and MDD features in the Products, the NRDC Report

observed:[22]

> The images for Samsung's TV (Figure 6) show that both Eco
> Sensor (the manufacturer's term for ABC) and Motion Lighting
> (its term for MDD) are enabled in the TV's default picture setting,
> called Standard. However, **once the picture setting is changed to
> another option – Dynamic, Natural or Movie – both of these
> energy-saving features are automatically disabled**.

(emphasis added).

44.     Even worse, the NRDC Report went on to discover that minor changes to the

default settings disabled the energy-saving features:[23]

> Of perhaps even **greater concern** is the way the software in some
> Samsung models was **designed so that a single click to adjust the
> contrast, brightness, or backlight levels in the menu causes
> MDD to be automatically disabled**, as shown in Figure 8, again
> without adequate notification to the user. **ABC was also disabled
> when any change was made to the backlight setting**.

(emphasis added).

45.     Not only did Samsung's firmware bypass installed as part of Defendant's

corporate policy make it almost certain consumers would disable the energy-savings features, but

it failed to warn consumers that these minor screen adjustments disabled these energy-saving

features:[24]

---

[22] *Id.* at 19

[23] *Id.* at 20

[24] *Id.*

When these changes are made, **there is no warning prompt, nor is the user offered the option to keep the energy-saving features enabled**. The MDD setting is grayed out and, for some models, the user is unable to reselect this feature from this screen. Instead, the message "This function isn't available" appears.

(emphasis added)

46.     Notably, the "ENERGY STAR® Program Requirements for Televisions: Partner Commitments," which discusses the partnership guidelines of the ENERGY STAR® program, expressly requires participating partners to warn consumers when a change will disable energy-saving features:[25]

Preset Picture Setting Menu: For any product where consumers have the option of selecting different picture settings from a preset menu at any time:

The product **shall display on-screen information that the Default Picture Setting reflects the setting under which the product qualifies for the ENERGY STAR**. For example, such information may be indicated by including an electronic ENERGY STAR mark alongside the name or description of that picture setting or in the form of a message displayed each time any setting other than the Default Picture Setting is selected.

(emphasis added).

47.     The NRDC Report summed up the egregious nature of Samsung's firmware bypass of energy-saving features[26]:

A simple change to the contrast or brightness settings on many Samsung TVs disabled MDD and changes to the backlight setting disabled both MDD and ABC. The user is not informed by any type of screen warning when this occurs. **This was the most extreme software design we encountered; no other manufacturer went this far to disable energy-saving features**.

(emphasis added).

---

[25] *Available at* https://www.energystar.gov/sites/default/files/FINAL%20Version%207.0%20Television%20Program%20Requirements%20(Dec-2014)_0.pdf (last visited Oct. 5, 2016)

[26] NRDC Report at 7 (Samsung has since told the NRDC it intends to alter its firmware bypass of the energy-saving features)

48.     Furthermore, the NRDC Report results showed that the clip developed by the IEC and used by the DOE contained much shorter scenes and more frequent cuts between them than typical real-world content (*e.g.*, sports, dramas, and news programs).  Because the MDD dims the television screen with rapid scene changes, the MDD produced energy-savings with the DOE clip's short scenes that are simply not realized when real-world content is displayed.[27]

49.     The NRDC Report noted that Samsung appears to have deployed MDD features to "*game*" the IEC test clip:

> [I]t's conceivable that some manufacturers might be **exploiting the abnormally high frequency of scene changes in the IEC test clip to maximize the effect of MDD** and obtain a better energy efficiency score, thereby gaining a competitive advantage.

(emphasis added).

50.     The U.S. Department of Energy has also conducted a similar preliminary study regarding the energy savings of MDD technology and is seeking comment on whether it should change its testing practices for measuring television energy consumption.  While not specifically named, the DOE test did include Samsung, and stated, "… for all tested models, the IEC [DoE test] clip usually triggered the largest reduction in power when [MDD was] enabled.  This is consistent with DOE's observation of the IEC test clip, which is composed of short segments of high motion video stitched together, so that the video content has faster changing scenes compared to most content a user typically would watch."[28]

51.     Lastly, the NRDC Report further commented that playing movies in high dynamic range ("HDR") is likely to significantly increase future the energy use of televisions, which is similarly not reflected under DOE test conditions.  In fact, energy use increased as much as 50 percent when HDR content was enabled on Ultra High Definition televisions.[29]

---

[27] *Id*. at 17

[28] *See* 2016-06-24 Energy Efficiency Program: Test Procedure for Televisions; RFI *available at* https://www.regulations.gov/document?D=EERE-2016-BT-TP-0023-0001, *last accessed* December 12, 2016

[29] NRDC Report. at 22-23

## C.       Plaintiffs' Experiences

### 1.       <u>Plaintiff Coghlan</u>

52.       Plaintiff Timothy Coghlan purchased a Samsung UN40H6350AF featuring Eco Sensor and Motion Lighting technology in Illinois during the Class period.  In deciding which television to purchase, Plaintiff Coghlan observed the ENERGYGUIDE label affixed to his Product.  Plaintiff Coghlan understood the ENERGYGUIDE label to represent that the television was among the most energy efficient of televisions.  Plaintiff Coghlan's purchase of a Product included a substantial price premium due to Samsung's Misrepresentation that the Product was among the most energy efficient of televisions.  Plaintiff Coghlan changed the factory default picture settings on his televisions shortly after activating the television.  Prior to adjusting these settings, Plaintiff Coghlan was not warned that the changes would reduce energy efficiency, causing him to incur additional charges on his electricity bill.

53.       Samsung's Misrepresentation that Plaintiff Coghlan's Product was among the most energy efficient of televisions was an immediate cause of Plaintiff Coghlan's decision to purchase the Product.  In all reasonable probability, he would not have agreed to purchase the Product, or would have sought materially different terms, had he known that the Misrepresentation was false and misleading.

54.       Samsung's Misrepresentation that the Product was among the most energy efficient of televisions played a substantial part, and so had been a substantial factor in, Plaintiff Coghlan's decision to purchase the television.

55.       Plaintiff Coghlan also understood that the purchase involved a direct transaction between himself and Samsung because the Product came with packaging and other materials prepared by Samsung, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Samsung as part of the transaction.

### 2.       <u>Plaintiff Ellish</u>

56.       Plaintiff Brad Ellish purchased a Samsung television featuring Eco Sensor and Motion Lighting technology at a retail store in Westchester County, New York, in late 2014 or

early 2015.  In deciding which televisions to purchase, Plaintiff Ellish observed prior to purchase that his Product was ENERGY STAR® certified – a representation Plaintiff Ellish relied on as a fair and accurate characterization of the energy usage of the television she purchased and understood to mean that the television was among the most energy efficient of televisions. Plaintiff Ellish's purchase of the Product included a substantial price premium due to Samsung's Misrepresentation that the Product was among the most energy efficient of televisions.  Plaintiff Ellish changed the factory default picture settings on his televisions shortly after activating the television.  Prior to adjusting these settings, Plaintiff Ellish was not warned that the changes would reduce energy efficiency, causing him to incur additional charges on his electricity bill.

57.     Samsung's Misrepresentation that Plaintiff Ellish's Products were among the most energy efficient of televisions was an immediate cause of Plaintiff Ellish's decision to purchase the Products.  In all reasonable probability, he would not have agreed to purchase the Products, or would have sought materially different terms, had he known that the Misrepresentation was false and misleading.

58.     Samsung's Misrepresentation that the Products were among the most energy efficient of televisions played a substantial part, and so had been a substantial factor in, Plaintiff Ellish's decision to purchase the television.

59.     Plaintiff Ellish also understood that the purchase involved a direct transaction between himself and Samsung because the Products came with packaging and other materials prepared by Samsung, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Samsung as part of the transaction.

**3.     Plaintiff Cali**

60.     Plaintiff Anthony Cali purchased a Product model number UN40J6200 featuring Eco Sensor and Motion Lighting technology in or around January 2016.  In deciding which televisions to purchase, Plaintiff Cali observed prior to purchase that his Product was ENERGY STAR® certified – a representation Plaintiff Cali relied on as a fair and accurate characterization of the energy usage of the television she purchased and understood to mean that the television

was among the most energy efficient of televisions. Plaintiff Cali's purchase of the Product included a substantial price premium due to Samsung's Misrepresentation that the Product was among the most energy efficient of televisions. Plaintiff Cali changed the factory default picture settings on his televisions shortly after activating the television. Prior to adjusting these settings, Plaintiff Cali was not warned that the changes would reduce energy efficiency, causing him to incur additional charges on his electricity bill.

61. Samsung's Misrepresentation that Plaintiff Cali's Products were among the most energy efficient of televisions was an immediate cause of Plaintiff Cali's decision to purchase the Products. In all reasonable probability, he would not have agreed to purchase the Products, or would have sought materially different terms, had he known that the Misrepresentation was false and misleading.

62. Samsung's Misrepresentation that the Products were among the most energy efficient of televisions played a substantial part, and so had been a substantial factor in, Plaintiff Cali's decision to purchase the television.

63. Plaintiff Cali also understood that the purchase involved a direct transaction between himself and Samsung because the Products came with packaging and other materials prepared by Samsung, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that he was purchasing warranty protection directly from Samsung as part of the transaction.

### 4. Plaintiff Loftus

64. Plaintiff Natalie Loftus purchased a Samsung television featuring Eco Sensor and Motion Lighting technology at a retail store in California. Plaintiff Loftus purchased the Product during the class period. In deciding which television to purchase, Plaintiff Loftus observed prior to purchase that her Product was ENERGY STAR® certified – a representation Plaintiff Loftus relied on as a fair and accurate characterization of the energy usage of the television she purchased and understood to mean that the television was among the most energy efficient of televisions. Plaintiff Loftus's purchase of a Product included a substantial price premium due to Samsung's Misrepresentation that the Product was among the most energy efficient of

televisions.  Plaintiff Loftus changed the factory default picture settings on her televisions shortly after activating the television.  Prior to adjusting these settings, Plaintiff Loftus was not warned that the changes would reduce energy efficiency, causing him to incur additional charges on his electricity bill.

65.     Samsung's Misrepresentation that Plaintiff Loftus's Product was among the most energy efficient of televisions was an immediate cause of Plaintiff Loftus's decision to purchase the Products.  In all reasonable probability, she would not have agreed to purchase the Products, or would have sought materially different terms, had she known that the Misrepresentation was false and misleading.

66.     Samsung's Misrepresentation that the Products were among the most energy efficient of televisions played a substantial part, and so had been a substantial factor in, Plaintiff Loftus's decision to purchase the television.

67.     Plaintiff Loftus also understood that the purchase involved a direct transaction between herself and Samsung because the Products came with packaging and other materials prepared by Samsung, including warranty materials referencing a manufacturer's warranty provided directly to the consumer, indicating that she was purchasing warranty protection directly from Samsung as part of the transaction.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs seek to represent a class defined as all persons in the U.S. who purchased, within the relevant statute of limitations period, a Samsung television manufactured between 2011 and the present which features Eco Sensor (automatic brightness control) and/or Motion Lighting (motion detection dimming) technology (the "Class").

69.     Plaintiff Loftus seeks to represent a subclass of all Class members who purchased a Product in the State of California (the "California Subclass").

70.     Plaintiff Coghlan seeks to represent a subclass of all Class members who purchased a Product in the State of Illinois (the "Illinois Subclass").

71.     Plaintiff Ellish and Plaintiff Cali seeks to represent a subclass of all Class members who purchased a Product in the State of New York (the "New York Subclass").

72.     Excluded from the Class and Subclasses are the Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest, as well as any judge assigned to hear this case.

73.     Also excluded from the Class and Subclasses are persons or entities that purchased the Products for purposes of resale.

74.     The Class, the California Subclass, the Illinois Subclass and the New York Subclass are each so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class, the California Subclass, the Illinois Subclass and the New York Subclass number in the tens of thousands.  The number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.

75.     The Class, California Subclass, Illinois Subclass and New York Subclass can be identified by objective criteria – the purchase of Defendant's Product in the respective jurisdiction during the statute of limitations period.  Notice can be provided to Class members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    (a)    whether Defendant misrepresented the Products as among the most energy efficient of televisions;

    (b)    whether Class members suffered an ascertainable loss as a result of the Defendant's Misrepresentation; and

    (c)    whether, as a result of Defendant's misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

76.     The Plaintiffs' claims are typical of the Class claims because the Plaintiffs and Class members all purchased the Products bearing the same Misrepresentation.  Plaintiff Loftus,

Plaintiff Coghlan and Plaintiff Ellish's claims are typical of their respective Subclass claims for the same reason.

77.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seeks to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

78.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Breach of Express Warranty

79.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

80.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendant.

81.     Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted that the Products were fit for their intended purpose in that they would function properly as energy efficient televisions within the parameters established by the ENERGY STAR® program, and the Misrepresentation.

82.     In fact, the Products do not function properly as energy efficient televisions within the parameters established by the ENERGY STAR® program, and the Misrepresentation.

83.     Plaintiffs and Class members were injured as a direct and proximate result of Defendant's breach because:  (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

**COUNT II**
**Breach of Implied Warranty of Merchantability**

84.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

85.     Plaintiffs bring this claim individually and on behalf of the members of the Class and the Subclasses against the Defendant.

86.     Defendant as the designer, manufacturer, marketer, distributor, and/or seller impliedly warranted that the Products were fit for their intended purpose in that they would function properly as energy efficient televisions within the parameters established by the ENERGY STAR® program, and the Misrepresentation.

87.     Defendant breached the warranty implied in the contract for the sale of the Products in that the Products could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose in that they did not function properly as energy efficient televisions within the parameters established by the ENERGY STAR® program, and the Misrepresentation.  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

88.     Plaintiffs and Class members are the intended beneficiaries of Defendant's implied warranties.

22

89.    In reliance upon Defendant's skill and judgment and the implied warranties, Plaintiffs and Class members purchased the Products for use as energy efficient televisions within the parameters established by the ENERGY STAR® program, and the Misrepresentation.

90.    The Products were not altered by Plaintiffs and Class members.  Any changes to image settings made by Class members constituted expected and ordinary use of a television.

91.    The Products were defective when they left the exclusive control of Defendant. The built-in firmware process by which the efficiency of the television was disabled and the benefits lost to the consumer upon making use of image controls constitutes a defect.

92.    Defendant knew the Product would be purchased and used without additional testing for energy efficiency by Plaintiffs and Class members.  The Products were defectively designed and unfit for their intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

93.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

## COUNT III
## Unjust Enrichment

94.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

95.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against the Defendant.

96.    Plaintiffs and Class members conferred a benefit on Samsung by purchasing the Products.

97.     Samsung misrepresented that the Products were among the most energy efficient of televisions for the purpose of generating retail sales which could and did increase the amount of direct and wholesale sales to Samsung.

98.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the Products.  Retention under these circumstances is unjust and inequitable because Samsung misrepresented that the Products were among the most energy efficient of televisions which caused injuries to Plaintiffs and Class members because (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

99.     Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs sand the Class members for their unjust enrichment, as ordered by the Court.

## COUNT IV
### Negligent Misrepresentation

100.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

101.     Plaintiffs bring this claim individually and on behalf of the members of the Class, the California Subclass and the Illinois Subclass against the Defendant.

102.     Defendant represented that the Products were among the most energy efficient of televisions.  To communicate this representation and to convince Plaintiffs and Class Members to purchase a Product, Defendant supplied Plaintiffs and Class Members with information, namely the ENERGYGUIDE label and the ENERGY STAR® logo.  Defendant knew, or should have known, that this information was false and/or misleading to Plaintiffs and Class Members.

103.     The Misrepresentation concerned material facts that influenced Plaintiffs' and Class members' purchase of the Products.

104.   Defendant knowingly made the Misrepresentation with the intent to induce Plaintiffs and Class members to act upon it by purchasing the Products.

105.   At the time Defendant made the Misrepresentation, Defendant knew or should have known that the Misrepresentation was false or Defendant made the Misrepresentation without knowledge of its truth or veracity.

106.   Plaintiffs and Class members reasonably, justifiably, and detrimentally relied on the Misrepresentation and, as a proximate result thereof, have and will continue to suffer damages in the form of lost money from the purchase price and increased energy costs over the life of the Products.

107.   Plaintiffs and Class members suffered a loss of money as a result of Defendant's false information because: (a) they would not have purchased the Products on the same terms if the true facts concerning the Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) they have paid and will continue to pay higher energy bills for as long as they continue to use the Products

## COUNT V
### Fraudulent Concealment / Nondisclosure

108.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

109.   Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against the Defendant.

110.   Defendant knew at the time of sale that it had falsely represented the Products as being among the most energy efficient of televisions because Defendant itself deployed a firmware bypass that silently disabled key energy-saving features of the Products.

111.   Defendant fraudulently concealed from and/or intentionally failed to disclose to Plaintiffs and the Class the true energy consumption of the Products with the energy-saving features disabled.

112.   Defendant had exclusive knowledge of Misrepresentation's falsity at the time of sale.  The defect (excess energy consumption) is latent and not something that Plaintiffs or Class

25

members, in the exercise of reasonable diligence, could have discovered independently prior to purchase, because it is not feasible for individual consumers to conduct their own energy efficiency testing prior to purchase.  The defect would not be disclosed by careful, reasonable inspection by the purchaser.

113.    Defendant had the capacity to, and did, deceive Plaintiffs and Class members into believing that Products they were purchasing were among the most energy efficient of televisions.

114.    Defendant undertook active and ongoing steps to conceal the defect.  Plaintiffs are aware of nothing in Defendant's advertising, publicity, or marketing materials that discloses the truth about the defect, despite Defendant's awareness of the problem.

115.    The facts concealed and/or not disclosed by Defendant to Plaintiffs and the Class are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or to pay the same price for) a television.

116.    Defendant had a duty to disclose an accurate estimate of the energy consumption of the Products at the time of sale, including on the ENERGYGUIDE label required by federal law.

117.    Defendant intentionally concealed and/or failed to disclose an accurate estimate of the energy consumption of the Products for the purpose of inducing Plaintiffs and the Class to act thereon.

118.    Plaintiffs and the Class justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment, as evidenced by their purchase of the Products.

119.    Plaintiffs and Class members suffered a loss of money as a result of Defendant's false information because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

## COUNT VI
### Intentional Misrepresentation

120.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

121.     Plaintiffs bring this claim individually and on behalf of the Class and Subclasses against Defendant.

122.     Defendant willfully, falsely, and knowingly misrepresented that the Products were among the most energy efficient of televisions.  The Misrepresentation was communicated through the ENERGYGUIDE labels Defendant affixed to each Products, as well as ENERGY STAR® logo that Defendant associated, in numerous ways, with the Products.

123.     At all relevant times, Defendant knew that it had misrepresented the Products as being among the most energy efficient of televisions because Defendant itself deployed a firmware bypass that silently disabled the key energy-saving features of the Products.

124.     Defendant's Misrepresentation was made with the intent that the general public, including Plaintiffs and Class members, would rely upon it.  Defendant's Misrepresentation was made with knowledge of the falsity of such statements, or in reckless disregard of the truth thereof.

125.     In actual and reasonable reliance upon the Misrepresentation, Plaintiffs and Class members purchased the Products for their intended and reasonably foreseeable purposes. Plaintiffs and Class members were unaware of the true facts concerning Defendant's Misrepresentation of the Products, which Defendant suppressed and failed to disclose. Defendant's Misrepresentation was material, in that if Plaintiffs and Class members had been aware of the suppressed facts, Plaintiffs and Class members would not have purchased the Products for the same price.

126.     Plaintiffs and Class members are informed and believe, and thereon allege, that Defendant misrepresented that the Products were among the most energy efficient of televisions with the intent to defraud Plaintiffs and Class members.  Plaintiffs and Class members were

unaware of Defendant's intent and relied upon the Defendant's Misrepresentation in deciding to purchase the Products.

127.   Plaintiffs and Class members' reliance upon Defendant's Misrepresentation was reasonable.  The defect (excess energy consumption) is latent and not something that Plaintiffs or Class members, in the exercise of reasonable diligence, could have discovered independently prior to purchase, because it is not feasible for individual consumers to conduct their own energy efficiency testing prior to purchase.

128.   In actual and reasonable reliance upon the Misrepresentation, Plaintiffs and Class members purchased the Products and experienced energy usage far above the levels represented, the direct and proximate result of which was injury and harm to Plaintiffs and Class members because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

## COUNT VII
### Fraud

129.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

130.   Plaintiffs bring this claim individually and on behalf of the Class and Subclasses against Defendant.

131.   As discussed above, Defendant provided Plaintiffs and Class members with false or misleading material information and failed to disclose material facts about the Products, including but not limited to the fact that the Products were not among the most efficient of televisions.

132.   The Misrepresentation made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, was intended to induce and actually induced Plaintiffs and Class members to purchase the Products.

133.     The fraudulent actions of Defendant caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

134.     Plaintiffs and Class members suffered a loss of money as a result of Defendant's fraudulent conduct because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiffs and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

**COUNT VIII**
**Violation of the Consumers Legal Remedies Act ("CLRA"),**
**Civil Code §§ 1750, *et seq.***

135.     Plaintiff Loftus repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.     Plaintiff Loftus brings this claim individually and on behalf of the members of the California Subclass against Defendant.

137.     Plaintiff Loftus and the California Subclass members are consumers who purchased the Products for personal, family or household purposes.  Plaintiff Loftus and the California Subclass members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

138.     The Products that Plaintiff Loftus and other California Subclass members purchased from Defendant were "goods" within the meaning of Cal. Civ. Code § 1761(a).

139.     Defendant's Misrepresentation violated and continues to violate the CLRA because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

140.     CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or

29

she does not have." Defendant violated this provision by representing the Products as among the most energy efficient of televisions.

141.    CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Defendant violated this provision by representing the Products as among the most energy efficient of televisions.

142.    CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Defendant violated this provision by representing the Products as among the most energy efficient of televisions.

143.    At the time it made the Misrepresentation and made sales to Plaintiff Loftus and the Subclass members, Defendant was aware of the defect because it deployed the firmware that disabled the energy-saving-features of the Product and thereby misrepresented the Products as being among the most energy efficient of televisions.

144.    Plaintiff Loftus and the California Subclass members suffered injuries caused by Defendant's Misrepresentation because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiff Loftus and the California Subclass members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

145.    On October 6, 2016, prior to the filing of this Complaint, a CLRA notice letter was served on Defendant Samsung that complies in all respects with California Civil Code § 1782(a). Plaintiffs sent Defendant a letter *via* certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770. A true and correct copy of Plaintiffs' CLRA letter is attached hereto as Exhibit A.

146.    Wherefore, Plaintiff Loftus seeks damages, restitution and injunctive relief for this violation of the CLRA.

**COUNT IX**
**Violation of the Unfair Competition Law ("UCL"),**
**Bus. & Prof. Code §§ 17200 *et seq.***

147.    Plaintiff Loftus repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

148.    Plaintiff Loftus brings this claim individually and on behalf of the California Subclass against Defendant.

149.    Defendant is subject to the Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part:  "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

150.    Defendant's conduct, described herein, violated the "unlawful" prong of the UCL by violating the CLRA and FAL.

151.    Defendant's conduct, described herein, violated the "unfair" prong of the UCL by misrepresenting the Products as being among the most energy efficient of televisions, and by programming a firmware bypass that silently disables key energy-saving features.

152.    Defendant's conduct, described herein, violated the "fraudulent" prong of the UCL by misrepresenting the Products as being among the most energy efficient of televisions, and by programming a firmware bypass that silently disables key energy-saving features.

153.    Plaintiff Loftus and California Subclass members suffered lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiff Loftus and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

## COUNT X
## False Advertising Law ("FAL"),
## Business & Professions Code § 17500 *et seq.*

154.     Plaintiff Loftus repeats the allegations contained in the above paragraphs as if fully set forth herein.

155.     Plaintiff Loftus brings this claim individually and on behalf of the California Subclass against Defendant.

156.     California's False Advertising Law (*Bus. & Prof. Code* § 17500, *et seq.*) makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

157.     Defendant committed acts of false advertising, as defined by §17500, by using false and misleading statements to promote the sale of Products, as described above.

158.     Defendant knew or should have known, through the exercise of reasonable care that the statements were untrue and misleading.

159.     Defendant's actions in violation of § 17500 were false and misleading such that the general public is and was likely to be deceived.

160.     Plaintiff Loftus and California Subclass members suffered lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiff Loftus and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

<u>COUNT XI</u>
**Violation Of Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1, *et seq.***

161.    Plaintiff Coghlan repeats the allegations contained in the paragraphs above as if fully set forth herein.

162.    Plaintiff Coghlan brings this claim individually and on behalf of the Illinois Subclass against Defendant.

163.    As alleged herein, Plaintiff Coghlan and members of the Illinois Subclass have suffered injury in fact and lost money or property as a result of Defendant's conduct because the purchased one of the Products which Defendant Misrepresented as among the most energy efficient of televisions.

*164.*    At all times relevant hereto, the sale of the Products in Illinois were governed by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*

165.    The ICFA is a regulatory and remedial statute intended to protect consumers, including Plaintiff Coghlan and the Illinois Subclass, against unfair or deceptive acts or practices.

166.    Specifically, Section 2 of the ICFA prohibits deceptive acts or practices, which are committed in the course of trade or commerce and with the intent that others rely upon. *See* 815 ILCS 505/2, which states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

167.    In addition, 815 ILCS 510/2(a)(5) of the Uniform Deceptive Trade Practices Act states:

> "A person engages in a deceptive trade practice when, in the
> course of his or her business, vocation, or occupation, the person
> … represents that goods or services have ... characteristics, …
> uses, [or] benefits … that they do not have. …"

168. The above-described unfair or deceptive acts or practices occurred in the course of conduct involving trade or commerce, namely, the sale of goods to Plaintiff Coghlan and the Illinois Subclass.

169. Defendant's practice of knowingly and unlawfully engaging in the activity described above also constitutes "unfair" business acts or practices because, inter alia, Defendant engaged in false advertising, which misrepresents and omits material facts regarding the Product.

170. Defendant's business acts or practices therefore offend an established public policy, and Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers, as alleged in detail previously, and therefore Defendant's actions are unfair or deceptive acts or practices prohibited by Chapter 2 of the ICFA. 815 ILCS 505/2.

171. Defendant intended that Plaintiff Coghlan and the Illinois Subclass rely on the Misrepresentation described herein.  Defendant's intent is evidenced by, inter alia, the fact that Defendant used test defeat features in order obtain deceptive Energy Guide labels for the Products to make them appear to be among the most energy efficient of televisions.

172. Any consumer wishing to purchase the Product would have seen the prominent yellow "ENERGYGUIDE" label on the store display model or on Defendant's or retailer's website, displayed according to federal Department of Energy regulations.

173. Defendant's Misrepresentation described above have caused harm to Plaintiff Coghlan and other members of the Illinois Subclass.

174. Plaintiff Coghlan and the Illinois Subclass reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

175. Plaintiff Coghlan and the other members of the Illinois Subclass have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

176.     Plaintiff Coghlan and the other members of the Illinois Subclass would not have purchased the Products or would have paid less for them had they known about Defendant's deceptive conduct.  Plaintiff and members of the Illinois Subclass also paid more for electricity costs than they would have had Defendant's products performed as advertised.

**COUNT XII**
**Violation Of New York Gen. Bus. Law § 349**

177.     Plaintiff Ellish and Plaintiff Cali repeat the allegations in the foregoing paragraphs as if fully set forth herein.

178.     Plaintiff Ellish and Plaintiff Cali bring this claim individually and on behalf of the members of the New York Subclass against Defendant.

179.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices for the purpose of generating retail sales, which could and did increase the amount of wholesale sales to Defendant.

180.     The foregoing deceptive acts and practices were directed at consumers.

181.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Products to induce consumers to purchase the Products.

182.     Plaintiff Ellish, Plaintiff Cali and members of the New York Subclass were injured and harmed because:  (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiff Ellish, Plaintiff Cali and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

183.     As a result of Defendant's Misrepresentation of fact, Plaintiff Ellish, Plaintiff Cali and members of the New York Subclass have suffered economic injury.

184.     Plaintiff Ellish, Plaintiff Cali and members of the New York Subclass suffered an ascertainable loss caused by Defendant's Misrepresentation equal to the price premium they paid for the Product.

185.    On behalf of themselves and other members of the New York Subclass, Plaintiff Ellish and Plaintiff Cali seek to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT XIII**
**Violation Of New York Gen. Bus. Law § 350**

186.    Plaintiff Ellish and Plaintiff Cali repeat the allegations in the foregoing paragraphs as if fully set forth herein.

187.    Plaintiff Ellish and Plaintiff Cali bring this claim individually and on behalf of the members of the New York Subclass against Defendant.

188.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Defendant.

189.    The foregoing deceptive acts and practices were directed at consumers.

190.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Products to induce consumers to purchase the same.

191.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

192.    Defendant's Misrepresentation resulted in consumer injury and harm to the public interest.

193.    Plaintiff Ellish, Plaintiff Cali and members of the New York Subclass were injured because (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Misrepresentation had been known; (b) they paid a price premium due to the Misrepresentation; (c) the Products did not perform as promised; and (d) Plaintiff Ellish, Plaintiff Cali and Class members have paid and will continue to pay higher energy bills for as long as they continue to use the Products.

194.     As a result of Defendant's Misrepresentation, Plaintiff Ellish, Plaintiff Cali and members of the New York Subclass have suffered and continue to suffer economic injury.

195.     Plaintiff Ellish, Plaintiff Cali and members of the New York Subclass suffered an ascertainable loss caused by Defendant's Misrepresentation equal to the price premium they paid for the Products.

196.     On behalf of themselves and other members of the New York Subclass, Plaintiff Ellish and Plaintiff Cali seek to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class, Plaintiff Loftus as a representative of the California Subclass, Plaintiff Coghlan as a representative of the Illinois Subclass, Plaintiff Ellish and Plaintiff Cali as representatives of the New York Subclass and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b.     For an order declaring that the Defendant's conduct violates the statutes referenced herein;

c.     For an order finding in favor of Plaintiffs, the nationwide Class, the California Subclass, the Illinois Subclass and the New York Subclass on all counts asserted herein;

d.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.     For prejudgment interest on all amounts awarded;

f.     For an order of restitution and all other forms of equitable monetary relief;

g.      For injunctive relief as pleaded or as the Court may
        deem proper; and

h.      For an order awarding Plaintiffs, the Class, the
        California Subclass, the Illinois Class and the New York
        Subclass their reasonable attorneys' fees and expenses
        and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 30, 2017

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____/s/ Neal J. Deckant_____
     Neal J. Deckant

Scott A. Bursor
Neal J. Deckant
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email:  scott@bursor.com
    ndeckant@bursor.com

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By: _____/s/ Fred T. Isquith_____
     Fred T. Isquith

Fred T. Isquith
Thomas H. Burt
Theo Bell
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: isquith@whafh.com
    tbell@whafh,com

**LEMBERG LAW, LLC**
Sergei Lemberg
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile: (203) 653-3424
Email:  slemberg@lemberglaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>
TIMOTHY COGHLAN, BRAD ELLISH,<br>
ANTHONY CALI and NATALIE LOFTUS,<br>
individually and on behalf of all others similarly<br>
situated,<br><br>
Plaintiffs, <br>
v.<br><br>
SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>
Defendant.
</td>
<td>
Civil Action No.<br><br>
<b>AFFIDAVIT OF VENUE</b>
</td>
</tr>
</table>

I, Neal J. Deckant, declare as follows:

      1.      I am an attorney at law licensed to practice in the State of New York.  I am a member of the bar of this Court, and I am a lawyer with Bursor & Fisher, P.A., counsel for Plaintiffs (additional counsel for Plaintiffs are listed on the final page of the accompanying Class Action Complaint).  I make this declaration to the best of my knowledge, information, and belief of the facts stated here.

      2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant Samsung does business throughout this District and Defendant has consented to consolidated proceedings this District in connection with the following matters:  *Stine v. Samsung Electronics America, Inc.*, No. 16-cv-02397 (E.D. Cal.); *Coghlan v. Samsung Electronics America, Inc.*, No. 16-cv-09658 (N.D. Ill.); and *Cali v. Samsung Electronics America, Inc.*, No. 16-cv-05412 (E.D.N.Y.).  Additionally, Defendant Samsung is a citizen of New York, given that it is a New York corporation.  Likewise, Plaintiffs Anthony Cali and Brad Ellish are citizens of New York, and Plaintiff Ellish resides in this District and purchased his Samsung television in this District.

1

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members for each relevant state and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendant.

I declare under the penalty of perjury under the laws of the States of California and New York and the United States that the foregoing is true and correct and that this declaration was executed at New York, New York this 30th day of January, 2017.

_____
Neal J. Deckant

**EXHIBIT A**

# BURSOR & FISHER
P.A.

1990 NORTH CALIFORNIA BLVD.
SUITE 940
WALNUT CREEK, CA 94596-7351
www.bursor.com

L. TIMOTHY FISHER
Tel: 925.300.4555
Facsimile: 925.407.2700
ltfisher@bursor.com

October 6, 2016

*Via Certified Mail - Return Receipt Requested*

Samsung Electronics America, Inc.
85 Challenger Road
Ridgefield Park, NJ 07660

Re:     *Demand Letter Pursuant to California Civil Code § 1782;*
        *Violation of the Magnuson-Moss Act, 15 U.S.C. §§ 2301, et seq.; and*
        *Violation of U.C.C. §§ 2-313, 2-314*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Samsung Electronics America, Inc. ("Samsung") pursuant to the provisions of California Civil Code § 1782, on behalf of our client, Marletta Stine, and all other persons similarly situated. This letter also serves as notice pursuant to U.C.C. § 2-607(3)(A) concerning the breaches of express and implied warranties described herein.

This notice concerns (i) 2014 to 2016 Samsung televisions that are (ii) 4K / UHD or ENERGY STAR® certified and (iii) have a screen size of 32 inches or greater (collectively, the "Mislabeled Televisions"). Samsung misrepresents that the Mislabeled Televisions are among the most energy efficient of televisions ("the Misrepresentation") through (a) the ENERGYGUIDE labels affixed to all Mislabeled Televisions, and (b) the ENERGY STAR® logo, which indicates that the Mislabeled Televisions meet the ENERGY STAR® program standards for energy efficiency.

Independent testing commissioned by the Natural Resources Defense Council ("NRDC") reveals that the Mislabeled Televisions are programmed to silently disable key energy-saving features when consumers adjust the default picture settings. Moreover, Defendant specifically optimized and tailored these energy-saving features to create a reduction in energy usage during testing with the U.S. Department of Energy ("DOE"), which is not reflected under real world conditions. Thus, the NRDC estimates that Samsung's conduct doubles the expected energy costs of the Mislabeled Televisions. This increased energy consumption fails to meet applicable ENERGY STAR® certification standards and renders the ENERGYGUIDE label energy cost estimations false and misleading.

Ms. Stine purchased a Samsung 4K/ UHD television at a Walmart store in California. In deciding which television to purchase, Ms. Stine observed that the Samsung 4K/UHD television

was ENERGY STAR® certified – a representation that Ms. Stine understood to mean the television was among the most efficient of televisions.

Samsung's misrepresentation of the Samsung 4K/ UHD television's energy efficiency was an immediate cause of Ms. Stine's decision to purchase the Samsung 4K/ UHD television. In all reasonable probability, she would not have agreed to purchase the Samsung 4K/ UHD television, or would have sought materially different terms, had she known the Misrepresentation was false and misleading.

Samsung's representation that the Samsung 4K/ UHD television was among the most energy efficient of televisions played a substantial part, and so had been a substantial factor in, Ms. Stine's decision to purchase the Samsung 4K/ UHD television.

By misrepresenting, mislabeling, and selling the Mislabeled Televisions, Samsung violated numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9).

We hereby demand that Samsung immediately (1) cease and desist from further illegal sales of the Mislabeled Televisions, (2) issue an immediate recall of the Mislabeled Televisions; (3) make full restitution to all purchasers of the Mislabeled Televisions of all purchase money obtained from sales thereof; and (4) compensate all purchasers for the increased energy costs they have incurred as a result of the Mislabeled Televisions' failure to conform with the energy efficiency standards communicated in the Misrepresentation.

It is further demanded that Samsung preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.  All documents concerning tests of the energy efficiency of the Mislabeled Televisions;

2.  All communications with the U.S. Department of Energy ("DOE"), U.S. Environmental Protection Agency ("EPA"), or the U.S. Federal Trade Commission ("FTC") concerning the energy efficiency of the Mislabeled Televisions manufactured by Samsung;

3.  All documents concerning the advertisement, marketing, or sale of the Mislabeled Televisions;

4.  All communications with customers concerning complaints or comments concerning the Mislabeled Televisions;

5.  All communications concerning the persistence of energy saving features on Samsung televisions, including but not limited to the "Eco Sensor" and "Motion Lighting" energy saving features; and

6.      All communications concerning any reports released by the
National Resource Defense Council.

Please comply with this demand within 30 days from receipt of this letter.

We are willing to negotiate with Samsung to attempt to resolve the demands asserted in
this letter.  If Samsung wishes to enter into such discussions, please contact me immediately.

If Samsung contends that any statement in this letter is inaccurate in any respect, please
provide us with your contentions and supporting documents immediately upon receipt of this
letter, but in no event later than 30 days from the date of receipt.

Very truly yours,

L. Timothy Fisher